## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

ALEX COLEMAN                                             PLAINTIFF
Reg. No. 28929-009

V.                              4:16CV00759-BRW/JTR

DOC HOLLADAY, Sheriff;
CAROL McGEE;
FELICIA ROBINSON, Deputy;
MISTY HODGES, Deputy; and
TEQUILA TURNER, Deputy,
Pulaski County Detention Center                          DEFENDANTS

### RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent
to United States District Judge Billy Roy Wilson. You may file written objections to
all or part of this Recommendation. If you do so, those objections must: (1)
specifically explain the factual and/or legal basis for your objection; and (2) be
received by the Clerk of this Court within fourteen (14) days of the date of this
Recommendation. If you do not file objections, Judge Wilson can adopt this
Recommendation without independently reviewing all of the evidence in the record.
By not objecting, you may waive the right to appeal questions of fact.

## I.  Introduction

Plaintiff Alex Coleman ("Coleman") has filed this *pro se* § 1983 action
alleging that, while he was a pretrial detainee in the Pulaski County Regional

Detention Facility ("PCRDF"),[1] Defendants Pulaski County Sheriff Doc Holladay ("Holladay"), Carol McGee ("McGee"), Deputy Felicia Robinson ("Robinson"), Deputy Misty Hodges ("Hodges), and Deputy Tequila Turner ("Turner") violated his due process rights by placing him on "suicide watch" when he engaged in a hunger strike to protest inadequacies in the PCRDF law library.[2] *Docs. 2 & 5.*

All Defendants have filed a Motion for Summary Judgment, a Brief in Support, a Statement of Undisputed Facts, and a Reply. *Docs. 27, 28, 29 & 42.* Coleman has filed a Response. *Doc. 41.*

Before addressing the merits of Defendants' Motion, the Court will summarize the relevant facts giving rise to Coleman's claim:[3]

1.    In September 2016, Coleman was a pretrial detainee in the PCRDF, awaiting trial on federal charges. *Doc. 2, at 3, 4 & 7; Doc. 28, Ex. 1 ¶5* (Ballard Aff.)

---

[1]Coleman is now incarcerated in the Fort Worth Federal Medical Center. *Doc. 37.*

[2]During 28 U.S.C. § 1915A screening, the Court dismissed Coleman's other claims, which included his: (1) access to the courts, inhumane conditions of confinement, and equal protection claims against Defendants Holladay, McGee, Robinson, Hodges and Turner; and (2) his claim against the "Pulaski County Detention Facility." *Docs. 7 & 9.*

[3]Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact.  *Celotex*, 477 U.S. at 323. Thereafter, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. *See* Fed. R. Civ. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

& *Ex. 1-1* (PCRDF Book-In Sheet).

2.      On September 22, 2016, Coleman did not pick up his breakfast tray. When a non-party deputy went to check on Coleman, Coleman said he was on a hunger strike because "he was a federal inmate and wanted to get out of the facility." A "hunger strike log" was started. *Doc. 28, Ex. 1-5* (Ouzts Incident Report).

3.      Later that day, after receiving a report that Coleman was on a hunger strike, Defendant McGee, a licensed certified social worker, visited him in his cell. Coleman told McGee that: he was not sure if he ate anything on September 20; he did not eat anything on September 21; and he had not eaten anything that day (September 22). He explained he was on a hunger strike because he wanted to be moved to a facility with a "better law library" so that he could "work on his case." *Id., Ex. 1-6* (PCRDF Progress Notes).

4.      According to McGee's treatment notes, she told Coleman that refusing to eat was a form of self-harm and that, if he did not eat, he would be placed on "suicide watch." Coleman told McGee he understood. *Id., Ex. 1-6.* Coleman disputes this, asserting that McGee told him he would be placed in "administrative segregation, not suicide watch." *Doc. 41, at 2.*

5.      After her visit with Coleman, McGee placed him on suicide watch for refusing to eat, and he was moved to a segregation unit for observation (T Unit). *Doc. 28, Ex. 1 ¶¶ 10-11, 19, & Ex. 1-7* (Seg Rounds). Defendants Robinson and

3

Hodges escorted him to T Unit. *Doc. 2, at 6.*

6.    When Coleman was placed on suicide watch, he was required to remove his clothing and was issued a "paper suit" to wear. He was also required to surrender his personal effects, including court documents and legal notes. *Doc. 2, at 6; Doc. 5, at 2; Doc. 41, at 2.*

7.    On the morning of September 25, 2016, a non-party social worker completed a PCRDF Medical Communication Form, stating that, based on reports from Coleman and a deputy, Coleman was now eating and drinking and thus no longer required suicide watch or segregation.[4] *Doc. 28, Ex. 1-9* (Medical Communication Form).

8.    Soon thereafter, Coleman was taken off suicide watch, and he was moved to general population in D Unit. *Doc. 28, Ex. 1 ¶ 17, & Ex. 1-7.*

9.    At noon on September 25, a non-party deputy heard Coleman stating that he was again declaring a hunger strike because the PCRDF law library was out of date. The deputy contacted a sergeant and medical staff, and he started a "meal observation log." *Id., Ex. 1-10* (Curtner Incident Report). Coleman was *not* moved from D Unit or placed on suicide watch at that time.

---

[4]According to Coleman, he was still on a hunger strike at this time and had eaten no food. *Doc. 41, at 2.*

10.    Two days later, on September 27, 2016, Coleman was placed on suicide watch as a result of his refusal to eat. Defendant Turner escorted him to a segregation unit (U Unit). Medical staff was called, and a "suicide smock and gown" was sent to Coleman's cell. *Doc. 2, at 6; Doc. 28, Ex. 1 ¶ 24, Ex. 1-11* (Hoof Incident Report) *& Ex. 1-12* (Medical Communication Form). Coleman was again required to surrender all of his personal property. *Doc. 2, at 6-7; Doc. 5, at 2; Doc. 41, at 3.*

11.    On September 28, 2016, McGee checked on Coleman and noted that he remained on a hunger strike, but wanted off suicide watch. She told him that he would remain on suicide watch as long as he was on a hunger strike. *Doc. 28, Ex. 1-6 & Ex. 1-7.*

12.    On September 29, 2016, Coleman informed McGee that he was no longer on a hunger strike, and he ate part of his breakfast. McGee noted that Coleman no longer needed suicide precautions or segregation. He was returned to general population. *Doc. 28, Ex. 1 ¶ 23, Ex. 1-6 & Ex. 1-14.* According to Coleman, he "reluctantly" ended his hunger strike "under duress" so that he could have access to his legal documents and notes before his upcoming trial. *Doc. 41, at 3.*

13.    PCDRF policy requires staff to respond to "any suspected, implied or confirmed inmate hunger strike by treating it as a potential health care emergency." *Doc. 44, Ex. 1-4 § II* (Branch Directive D11-0008).

14.    According to that policy, when an inmate declares or implies that he or

she intends to go on a hunger strike, the deputy must: (a) immediately notify a supervisor; (b) record the information in the Unit Log; (c) contact health care staff; (d) complete an incident report form; (e) monitor the inmate regularly; and (e) start a meal consumption log. *Id., Ex. 1-4 § III(C)(1).*

15.    Medical personnel evaluates the inmate within a reasonable period of time, monitors the inmate regularly, and determines "if and when the inmate's condition warrants a greater level of intervention to ensure the welfare of the inmate." *Id., Ex. 1-4 § III(C)(2) & (D).*

16.    To assure the security and safety of the facility, staff, public and inmates, the PCRDF classifies and houses inmates according to behaviors, actions, program needs and other special requirements. *Doc. 28, Ex. 1-2 §§ I & II* (Branch Directive D03-0003).

17.    Inmates in Classification Level 4 require segregation from the general population "to ensure the security and orderly operations of the facility." *Id., Ex. 1-2 § III(I)(1).* PCRDF classifies inmates who pose a risk of suicide as "Level 4.1 Special Needs Inmates." *Id., Ex. 1-2 § III(I)(3)(a).* Because these inmates need "special, more constant supervision," PCRDF policy requires that they be "reassigned to a housing area that affords suicide watch." *Id., Ex. 1-2 § III(I)(3)(a)(4) & Ex. 1-3 § II(A)(1)(c)* (Branch Directive D10-0021). If possible, suicidal inmates are housed in the PCRDF medical segregation units (T and U Units) for closer

6

observation, and cells are to be made "as suicide proof as possible." *Id., Ex. 1-3 §
II(A)(5).*

## II.  Discussion

### A.    Official Capacity Claims

Coleman has sued Holladay in his official capacity because he is "over the
facility" and "has the power to change how things are run."[5] *Doc. 2, at 2; Doc. 5, at
3.* He has sued McGee, Robinson, Hodges and Turner in their official capacities
because they were "follow[ing] the chain of command that Doc Holladay and the
[PCDRF] rules … set for inmates." *Doc. 5, at 3-4.*

As a matter of law, the official capacity claims that Coleman has asserted
against Defendants must be construed as claims against their employer, Pulaski
County. *See Kentucky v. Graham,* 473 U.S. 159, 166 (1985) ("[A]n official-capacity
suit is, in all respects other than name, to be treated as a suit against the entity."). A
claim against a county is sustainable "only where a constitutional violation has been
committed pursuant to an official custom, policy or practice." *Luckert v. Dodge
County,* 684 F.3d 808, 820 (8th Cir. 2012) (citing *Monell v. Dept. of Soc. Servs.*, 436
U.S. 658, 691-94 (1978)). Importantly, the official policy, custom or practice must

---

[5]Coleman has also sued Holladay in his individual capacity, without asserting any
individual capacity claims against the other Defendants. *See Doc. 2, at 2; Doc. 5, at 3-4.*

be the "cause of" or "moving force behind" the constitutional violation. *Id.*

Coleman argues that placing him on suicide watch because he was engaging in a hunger strike, pursuant to PCRDF "policy," violated his due process rights.

It is well settled that the Due Process Clause prohibits pretrial detainees, who are presumed innocent of the crimes for which they have been charged, from being subjected to conditions that amount to "punishment." *See Bell v. Wolfish,* 441 U.S. 520, 535 (1979); *Hall v. Ramsey County,* 801 F.3d 912, 919 (8th Cir. 2015); *Smith v. Copeland,* 87 F.3d 265, 268 (8th Cir. 1996) ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt."). However, "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Bell,* 441 U.S. at 537. Instead, "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* at 539. The "Government has legitimate interests that stem from its need to manage the facility in which the individual is detained," such as maintaining safety or internal order. *Id.* at 540, 546-47.

Thus, segregating a pretrial detainee and placing him on suicide watch is not unconstitutional when the detainee has displayed, or has expressed an intent to engage in, self-harming behavior and the purpose of the placement is to prevent him from injuring himself. *Daniels v. Woodside,* 396 F.3d 730, 735 (6th Cir. 2005)

(finding no due process violations where a pretrial detainee was placed on suicide watch to "secure [the detainee's] well-being" and "in furtherance of the jail staff's legitimate and non-punitive purpose of preventing [the detainee's] suicide or injury"); *Conway v. Henze,* 14 Fed. Appx. 645, 650-51 (7th Cir. 2001) (relevant consideration in pretrial detainee's challenge to limitations imposed in holding cell where he was placed after he displayed self-harming behavior, is "whether the conditions were imposed with an intent to punish or pursuant to some legitimate administrative goal"); *Wells v. Coleman,* No. 3:12CV00021-JMM/JTR, 2012 WL 601238, at *2 (E.D. Ark. Feb. 7, 2012), *recommendation adopted* 2012 WL 602646 (E.D. Ark. Feb. 23, 2012) (finding no due process violation where pretrial detainee was placed on suicide watch after he threatened to harm himself and his cell mate, and not for punishment).[6]

In this case, it is undisputed that Coleman was placed on suicide watch after he declared that he was on a hunger strike, which was confirmed by PCRDF deputies and medical staff who were monitoring and evaluating him. The deprivations associated with his being on suicide watch were affirmative steps to monitor his

---

[6]S*ee also Hall,* 801 F.3d at 919 (placing a disruptive and uncooperative detainee in seclusion was "a reasonable means" of meeting the "legitimate governmental interest in maintaining order and efficiently managing the facility"); *Whitfield v. Dicker,* 41 Fed. Appx. 6, 7 (8th Cir. 2002) (placing a pretrial detainee in segregation is not unconstitutional when the purpose of the segregation is "for institutional security"); *Davis v. Hall,* 992 F.2d 151, 153 (8th Cir. 1993) (upholding placement of pretrial detainee in solitary confinement due to his medical condition).

condition and secure his well-being, in furtherance of the PCRDF's legitimate and non-punitive purpose of preventing self-harm. The PCDRF policies and practices at issue were obviously designed to protect, not punish, detainees.

In his Response to Defendants' Motion for Summary Judgment, Coleman asserts that McGee told him that, if he refused to eat, he would be placed in administrative segregation, *not* on suicide watch. He also alleges that McGee knew he posed no immediate threat of danger to himself or others, and placed him on suicide watch in retaliation for speaking out about the inadequacy of the law library.[7] Regardless of her subjective motives, McGee's placement of Coleman on suicide watch was fully consistent with PCRDF policy. Further, any dispute regarding what McGee told him is not material to the question at issue here: whether a PCRDF policy or practice subjected Coleman to "punishment" in a constitutional sense.

Coleman has not provided *any evidence* suggesting that his placement on suicide watch was anything other than a legitimate response to his behavior and actions, as authorized by PCRDF policy. Because Coleman has failed to show that his placement on suicide watch was a form of "punishment" violating his

---

[7]To the extent his Response attempts to raise a "new" claim of retaliation against McGee, it is not properly before the Court and cannot be considered in this action. *See Northern States Power Co. v. Fed. Transit Admin.,* 358 F.3d 1050, 1057 (8th Cir. 2004) ("[W]hile we recognize that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment."); *Cofer v. Schriro,* 17 Fed. Appx. 504, *1 (8th Cir. 2001) (claim raised for the first time in opposing summary judgment was not properly before the district court).

constitutional rights under the Due Process Clause, his official capacity claims should be dismissed, with prejudice.

## B.    Individual Capacity Claim Against Holladay

Holladay argues that Coleman's individual capacity claim against him should be dismissed because: (1) he is protected by qualified immunity from liability for monetary damages; and (2) he had no personal involvement in the alleged constitutional violation. The Court agrees with both arguments.

In evaluating a qualified immunity defense at the summary judgment stage, the Court asks two questions: (1) whether there was a violation of a constitutional right; and (2) whether the right was "clearly established" at the time of the violation. *Hall,* 801 F.3d at 916-17. "If either question is answered in the negative, the public official is entitled to qualified immunity." *Id.* at 917. Because, as explained, Coleman has failed to demonstrate the violation of a constitutional right, Holladay is entitled to qualified immunity.

In addition, Coleman's only allegations against Holladay are that he "is over the facility" and "has the power to change how things are run." *Doc. 5, at 3.* Such a claim of vicarious liability against Holladay is not actionable under § 1983. *See Parrish v. Ball,* 594 F.3d 993, 1001 (8th Cir. 2010); *Keeper v. King.,* 130 F.3d 1309, 1314 (8th Cir. 1997) (holding that the "general responsibility for supervising the operations of a prison in insufficient to establish the personal involvement required

to support [§ 1983] liability"). Instead, to state a viable claim, Coleman must plead facts indicating that Holladay, "through [his] own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009). Coleman has not pled any facts suggesting that Holladay was personally involved in the decision to place him on suicide watch, or in any other aspect of the alleged violation of his constitutional rights.

Accordingly, Coleman's individual capacity claim against Holladay should be dismissed, with prejudice.

## III.  Conclusion

IT IS THEREFORE RECOMMENDED THAT:

1.    Defendants' Motion for Summary Judgment (*Doc. 27*) be GRANTED.

2.    This § 1983 action be DISMISSED, WITH PREJUDICE, in its entirety.

DATED this 7th day of August, 2018.

_____
UNITED STATES MAGISTRATE JUDGE